No. 12-1671

—————————————

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

—————————————

BOBBY BLAND, DANIEL RAY CARTER, JR., DAVID W. DIXON,
ROBERT W. MCCOY, JOHN C. SANDHOFER, and DEBRA H. WOODWARD,

*Plaintiffs-Appellants*,

v.

B.J. ROBERTS,

*Defendant-Appellee.*

—————————————

On Appeal from the United States District Court
for the Eastern District of Virginia, No. 4:11-cv-00045-RAJ-TEM (Jackson, J.)

—————————————

## BRIEF OF FACEBOOK, INC. AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFF-APPELLANT DANIEL RAY CARTER, JR.
## AND IN SUPPORT OF VACATUR

—————————————

AARON M. PANNER
ANDREW E. GOLDSMITH
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Counsel for Amicus Curiae
Facebook, Inc.*

August 6, 2012

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Facebook, Inc. submits the following corporate disclosure statement:

Facebook, Inc. is a corporation organized under the laws of Delaware, and there is no parent corporation or publicly held corporation that owns 10% or more of its stock.  No publicly held corporation has a direct financial interest in the outcome of this litigation by reason of a franchise, lease, other profit sharing agreement, insurance, or indemnity agreement.

*/s/ Aaron M. Panner*
Aaron M. Panner

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF IDENTITY, INTEREST,
AND AUTHORITY TO FILE...................................................................1

SUMMARY OF ARGUMENT .............................................................. 2

ARGUMENT .................................................................................9

CONCLUSION .............................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Adams v. Trustees of the Univ. of North Carolina-Wilmington,*
   640 F.3d 550 (4th Cir. 2011) ................................................................13

*Berger v. Battaglia,*
   779 F.2d 992 (4th Cir. 1985) ...............................................................15

*Brady v. Fort Bend Cnty.,*
   145 F.3d 691 (5th Cir. 1998) ......................................................... 13, 14

*City of Ladue v. Gilleo,*
   512 U.S. 43 (1994) ....................................................... 11, 12, 14, 15

*Coady v. Steil,*
   187 F.3d 727 (7th Cir. 1999) ......................................................... 13, 14

*Cohen v. California,*
   403 U.S. 15 (1971) .............................................................................10

*Corbett v. Duerring,*
   No. 2:10-cv-01053, 2012 WL 1855193 (S.D. W. Va. May 21, 2012).......... 15, 16

*Cromer v. Brown,*
   88 F.3d 1315 (4th Cir. 1996) ...............................................................18

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
   489 U.S. 214 (1989) ...........................................................................11

*Givhan v. Western Line Consol. Sch. Dist.,*
   439 U.S. 410 (1979) ...........................................................................17

*Gresham v. City of Atlanta,*
   No. 1:10–CV–1301–RWS–ECS, 2011 WL 4601022
   (N.D. Ga. Aug. 29, 2011) ....................................................................14

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
   515 U.S. 557 (1995) ...........................................................................14

iii

*Jackson v. Bair*,
    851 F.2d 714 (4th Cir. 1988) ........................................................................ 15, 18

*Love-Lane v. Martin*,
    355 F.3d 766 (4th Cir. 2004) ...........................................................................18

*Mattingly v. Milligan*,
    No. 4:11CV00215 JLH, 2011 WL 5184283 (E.D. Ark. Nov. 1, 2011) ..............14

*McVey v. Stacy*,
    157 F.3d 271 (4th Cir. 1998) ......................................................................... 8, 13

*Ostergren v. Cuccinelli*,
    615 F.3d 263 (4th Cir. 2010) ...........................................................................10

*Rankin v. McPherson*,
    483 U.S. 378 (1987) ........................................................................................17

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997) ........................................................................................10

*Texas v. Johnson*,
    491 U.S. 397 (1989) ........................................................................................14

*United States v. Stevens*,
    130 S. Ct. 1577 (2010) ....................................................................................15

**OTHER AUTHORITIES**

Sara Burnett, *GOP, Democrats Take Political Scrap Online*, Denver Post (May 28, 2012, 1:00AM MDT), *available at* http://www.denverpost.com/politics/ci_20724874/gop-democrats-take-political-scrap-online (last visited Aug. 6, 2012) ..............................................................12

Facebook Website – Introducing Timeline, *available at* http://www.facebook.com/about/timeline (last visited Aug. 6, 2012). ..................4

Facebook Website – Create a Page, *available at* http://www.facebook.com/pages/create.php (last visited Aug. 6, 2012). ..............4

Jane S. Schacter, *Digitally Democratizing Congress? Technology and Political Accountability*, 89 B.U. L. Rev. 641 (2009)........................................................12

## STATEMENT OF IDENTITY, INTEREST, AND AUTHORITY TO FILE[1]

Facebook, Inc. ("Facebook") provides a free Internet-based service that enables its users to connect with their friends and family, to discover what is going on in the world around them, and to share what matters to them and to the people they care about. Facebook's members ("Users") can share and publish their opinions, ideas, photos, and activities to audiences ranging from their closest friends to Facebook's over 950 million Users, giving every User a voice within the Facebook community.

Facebook strives to create an online environment that facilitates communication, social connection, and the sharing of ideas, and in which Users can engage in debate and advocate for the political ideas, parties, and candidates of their choice. Facebook files this brief to explain how Facebook operates and thus to provide additional background that may illuminate the nature of the speech interests at stake in this case. Facebook, for itself and its Users, has a vital interest in ensuring that speech on Facebook and in other online communities is afforded the same constitutional protection as speech in newspapers, on television, and in the town square.

---

[1] No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person other than the *amicus curiae* or its counsel contributed money intended to fund preparing or submitting this brief.

On August 6, 2012, Facebook filed a motion for leave to file this brief as *amicus curiae*. Plaintiffs consented to Facebook's request, but Defendant did not.

## SUMMARY OF ARGUMENT

When a Facebook User Likes a Page on Facebook, she engages in speech protected by the First Amendment. In this case, Plaintiff Daniel Ray Carter, Jr. alleges that Defendant B.J. Roberts, the elected sheriff of Hampton, Virginia, fired him from his position as deputy sheriff because Carter Liked the Facebook campaign Page of Roberts's challenger in the 2009 election, and that his firing violated his rights under the First Amendment. The district court's holding that "'liking' a Facebook page is insufficient speech to merit constitutional protection" because it does not "involve[ ] actual statements," J.A. 1159, betrays a misunderstanding of the nature of the communication at issue and disregards well-settled Supreme Court and Fourth Circuit precedent. Liking a Facebook Page (or other website) is core speech: it is a statement that will be viewed by a small group of Facebook Friends or by a vast community of online users.

When Carter clicked the Like button on the Facebook Page entitled "Jim Adams for Hampton Sheriff," the words "Jim Adams for Hampton Sheriff" and a photo of Adams appeared on Carter's Facebook Profile in a list of Pages Carter had Liked, J.A. 570, 578 – the 21st-century equivalent of a front-yard campaign sign. In addition, an announcement that Carter likes the campaign's Page was

2

shared with Carter's Friends, and Carter's name and photo appeared on the campaign's Page in a list of people who Liked the Page. *See* J.A. 570, 578. If Carter had stood on a street corner and announced, "I like Jim Adams for Hampton Sheriff," there would be no dispute that his statement was constitutionally protected speech. Carter made that very statement; the fact that he did it online, with a click of a computer's mouse, does not deprive Carter's speech of constitutional protection.

This Court should accordingly vacate the grant of summary judgment in favor of Roberts in his individual capacity as to Carter's free speech claim and remand the case so that the district court can continue the analysis it short-circuited with its erroneous conclusion that Carter did not engage in protected speech.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

**A.**     Facebook enables fast, easy, and rich communication. Facebook Users can exchange photos, news stories, and notes about their daily lives. Over 500 million Facebook members use the site on a daily basis, and over 3 billion Likes and comments are posted every day.

---

[2] *Amicus curiae* Facebook takes no position on the district court's conclusion that Plaintiff Robert W. McCoy did not adequately describe his Facebook activity. *See* J.A. 1158. To the extent McCoy was terminated based on his Facebook activity, the analysis described here would apply to his claims as well.

3

Each Facebook User has a "Profile."[3]  A Profile typically includes, among other things, the User's name;[4] photos the User has placed on the website (including one photo that serves as the User's profile photo); a brief biographical sketch; a list of individual Facebook Users with whom the User is Friends; and – as described further below – a list of Facebook "Pages" the User has Liked.  *See* J.A. 577-78.  A Facebook User can adjust privacy settings to provide that various content on her Profile Page may be viewed only by Friends or more broadly by Facebook Users generally.

Unlike Profiles, which are designed for individuals to represent their identity, Facebook Pages are designed primarily for businesses, brands, sports teams, musical groups, and organizations – including religious groups and political campaigns – to share their stories and connect with Facebook Users.[5]  Each Page is managed by one or more "administrators" who control the Page and can upload photos and post messages on the Page, much as individual Users can on their Profiles.

---

[3] Facebook recently launched a new version of Profile called "Timeline," which offers different functionality, but those changes are not relevant to the issues in this case.  *See* http://www.facebook.com/about/timeline (last viewed Aug. 6, 2012).

[4] Unlike some other websites that provide similar services, Facebook requires its Users to provide their real names rather than nicknames.

[5] *See* http://www.facebook.com/pages/create.php (last viewed Aug. 6, 2012).

4

**B.**     When a User logs on to Facebook, the first thing the User typically sees is her Home Page. The Home Page has a three-column layout. The left-hand column contains links and tools that help the User to navigate the Facebook website. The right-hand column displays a variety of sponsored content (including advertisements) and non-sponsored content.[6] The center column of the Home Page contains the News Feed, which, for most Users, is the primary place where they see and interact with news and stories from and about their Friends and Pages they have connected with on Facebook. Each User's News Feed contains a customized and constantly updated flow of "stories" about the User's Friends and selected Pages. Just as a User's News Feed includes information shared with that User by his Friends, the information that the User chooses to share with his Friends appears in *their* News Feeds.

**C.**     The "Like" button on Facebook, represented by a thumbs-up icon, is a way for Users to share information on Facebook. The Like button (like its pre-2010 precursor, the "Become a Fan" button) appears next to many different types of content on Facebook – including brands, politicians, religious organizations, charitable causes, and other entities that have established a presence on Facebook. Many other (that is, non-Facebook) websites have also incorporated Like buttons

---

[6] Since 2011, the right-hand column of the Home Page has displayed a Ticker that includes updates concerning a User's Friends' Facebook activity, and sponsored content.

5

so that Facebook Users can Like news articles, videos, photos, or other content elsewhere on the Internet.

A Facebook User who Likes content – on or off Facebook – by clicking the Like button makes a connection to that content. By clicking the Like button, a Facebook User generates an announcement known as a "Like story" that is posted to her Profile (now Timeline) page. For example, if Jane Smith Liked the UNICEF Facebook Page, the statement "Jane Smith likes UNICEF" would appear on her Profile page along with the title of the Page and an icon selected by the Page's administrator. *See* J.A. 578. The Page's title and icon function as an Internet link: another Facebook User who views the User's Profile can click on them and be taken to the Page.[7] If Jane Smith Liked an article on CNN's website about UNICEF's activity in sub-Saharan Africa, the statement "Jane Smith likes this article" would appear with a link to the article.

As with virtually all of the content Users choose to share on Facebook, the Like story on the User's Profile page is displayed to the User's chosen audience – including, in most cases, the User's Friends. The Like story may also appear in Friends' News Feeds. When a User's Like statement is viewed by a User's Friends, it generally appears with the User's name and/or Profile Picture.

---

[7] In 2009, at the time of the events at issue in this case, after a User Liked a Facebook Page, the User's name and profile photo appeared on the Page. Today, the identities of the Users who have Liked a Facebook Page are visible to the administrator of the Page but not to the public.

When a Facebook User clicks the Like button, she is expressing an idea, both via her Profile and via her Friends' News Feeds. She is telling other Users something about who she is and what she likes.

**D.** Deputy Sheriff Carter visited the Facebook Page of Jim Adams's campaign for sheriff, named "Jim Adams for Hampton Sheriff," and clicked on the Like button on that Page. J.A. 567, 570, 576-78. The campaign's Page announced that Adams was running for sheriff in Hampton, Virginia, and displayed a professionally taken photo of Adams in uniform and a statement of his plans if elected. J.A. 576.

According to the record, after Carter Liked the campaign's Page, the title of the Page – the slogan, "Jim Adams for Hampton Sheriff" – and a photo of Adams, which the campaign Page's administrator had selected as the Page's icon, were added to Carter's Profile. J.A. 578. The version of Carter's Profile visible to all Facebook Users featured a photo of him and his wife on their wedding day, a brief biographical sketch, a list of individual Facebook Users with whom Carter was Friends, and a list of Facebook Pages that he Liked. J.A. 577-78.[8] "Jim Adams for

---

[8] The printout of Carter's Profile data submitted to the district court depicts data available to Facebook Users who were not Carter's Friends, because it includes a link Users can click to "Add [him] as [a] Friend" – a link that would not appear if the Profile were viewed by individuals who were already Carter's Friends. J.A. 577. Facebook Users who were Friends with Carter would see at least the same material available to all Users and possibly more, such as additional photographs of Carter and his family and messages from Carter. As explained

7

Hampton Sheriff" and Adams's photo were added to the list of Facebook Pages that Carter Liked. J.A. 578. The campaign slogan on Carter's Profile functioned as a link that Facebook Users could click to go from Carter's Profile to the campaign's Page. In addition, an announcement appeared in the News Feeds of Carter's Friends that Carter liked the campaign's Page. Finally, Carter's name and the photo he had selected as his Profile photo were added to a portion of the campaign's Page listing "People [Who] Like This." J.A. 570, 576.

Sheriff B.J. Roberts, the incumbent and Adams's opponent, was re-elected and fired Carter. J.A. 1155-56. Carter and other fired deputies who had supported Adams sued Roberts, alleging that they had been dismissed in retaliation for their exercise of their First Amendment rights, made applicable to the City of Hampton Sheriff's Office through the Fourteenth Amendment. *See* J.A. 1156; *see also* J.A. 15-16.

**E.** The district court granted summary judgment to Roberts. *See* J.A. 1154. The court held that Carter could not satisfy the first element of the test set out in this Court's decision in *McVey v. Stacy*, 157 F.3d 271 (4th Cir. 1998) – which applies to retaliatory discharge claims under the First Amendment – because "'liking' a Facebook page is insufficient speech to merit constitutional protection."

---

below, however, it does not matter whether Carter's statement could be viewed by all Facebook Users or more narrowly by Carter's Friends – either way, Liking the Adams campaign's Page was protected speech.

8

J.A. 1158-59.  The court reached that conclusion because, in its view, Liking a

Facebook Page does not "involve[] actual statements."  J.A. 1159.  Having

concluded that Carter did not engage in protected speech, the court did not conduct

the remainder of the First Amendment analysis required under *McVey*.  J.A. 1160.

## ARGUMENT

## "LIKING" THE ADAMS CAMPAIGN'S FACEBOOK PAGE WAS SPEECH ENTITLED TO CONSTITUTIONAL PROTECTION

**A.**     Liking a Facebook Page is entitled to full First Amendment

protection.  The district court reached a contrary conclusion based on an apparent

misunderstanding of the way Facebook works; the resulting decision clashes with

decades of precedent and bedrock First Amendment principles.  The Court should

squarely reject the district court's decision and reasoning, and reconfirm that

online speech must be afforded the same level of constitutional protection as all

other forms of speech.

**1.**     Contrary to the district court's understanding, Liking a Facebook Page

(or a non-Facebook website) *is* speech:  it generates verbal statements and

communicative imagery on the User's Profile (or Timeline) Page – *i.e.*, a statement

that the User likes a particular Page, accompanied by the Page's icon – as well as

similar statements and imagery in the News Feeds of the User's Friends.  In this

case, by Liking the Adams campaign's Page, Carter ensured that the slogan "Jim

Adams for Hampton Sheriff" would appear alongside Adams's photo on Carter's

9

Facebook Profile.  J.A. 576, 578.  Carter also triggered an announcement on his Friends' News Feeds and on the campaign's Page itself that he liked the campaign's Page.  Any visitor to Carter's Profile would have been able to see the candidate's photograph and campaign slogan.[9]  Carter's use of Facebook to "convey his message" was "speech" within the meaning of the First Amendment. *Cohen v. California*, 403 U.S. 15, 18 (1971).

Critically, Carter's statements are entitled to no lesser degree of First Amendment protection because he spoke online rather than elsewhere – a principle that the district court did not expressly question.  The Supreme Court so held in *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997), and this Court has likewise recognized the principle.  *See Reno*, 521 U.S. at 870 ("As the District Court found, 'the content on the Internet is as diverse as human thought.'  We agree with its conclusion that our cases provide no basis for qualifying the level of First Amendment scrutiny that should be applied to this medium." (citation omitted)); *Ostergren v. Cuccinelli*, 615 F.3d 263, 272 (4th Cir. 2010).

**2.**      Speech on Facebook – including the speech generated by Users' Liking of websites – may cover a vast array of subjects; like speech in any other

---

[9] The district court stated that it would "not attempt to infer the actual content of Carter's posts from one click of a button on Adams' Facebook page." J.A. 1159-60.  As demonstrated above, no inference is necessary; the content of the statements was in the record.  Moreover, it should not matter whether Carter generated those statements with one click of a mouse or two dozen keystrokes on a keyboard.

10

medium, *all* such speech is entitled to First Amendment protection with limited

exceptions not at issue here.  In this case, moreover, when Carter Liked a political

candidate's campaign Page, he issued an endorsement "at the core of our electoral

process and of the First Amendment freedoms."  *Eu v. San Francisco Cnty.*

*Democratic Cent. Comm.*, 489 U.S. 214, 222-23 (1989) (internal quotation marks

omitted).  "[T]he First Amendment has its fullest and most urgent application to

speech uttered during a campaign for political office."  *Id*. at 223 (internal

quotation marks omitted).  The Supreme Court has held that residential campaign

signs are protected by the First Amendment, describing them in terms equally

applicable to Carter's Liking the Adams campaign's Facebook Page.  *See City of*

*Ladue v. Gilleo*, 512 U.S. 43, 54-55 (1994).  Placing a sign at one's residence

conveys "a message quite distinct from placing the same sign someplace else . . . .

[S]uch signs provide information about the identity of the 'speaker.'"  *Id*. at 56.

In addition, "[r]esidential signs are an unusually cheap and convenient form of

communication.  Especially for persons of modest means or limited mobility, a

yard or window sign may have no practical substitute."  *Id*. at 57.  Carter's Liking

the Adams campaign's Facebook Page – like planting a campaign sign in his front

yard – demonstrated Carter's support in a manner directly attributable to Carter

himself, cost him nothing, and did not require him to leave his home.  The ease

with which Carter was able to generate statements of support for the Adams

11

campaign makes this form of speech, like the residential signs in *City of Ladue*, especially valuable and worthy of protection.

The use of social networking and other online communities to rally support for political candidates and causes is a contemporary example of quintessential political speech. After Facebook began allowing candidates to create campaign Pages in 2006, the site played significant roles in that year's congressional elections and in the 2008 presidential election. *See*, *e.g.*, Jane S. Schacter, *Digitally Democratizing Congress? Technology and Political Accountability*, 89 B.U. L. Rev. 641, 659 & n.79 (2009). The Republican National Committee recently unveiled a Facebook application that it will deploy in the 2012 presidential election, and President Obama's campaign has announced its own new online product that can be accessed through Facebook. *See* Sara Burnett, *GOP, Democrats Take Political Scrap Online*, Denver Post (May 28, 2012, 1:00AM MDT), *available at* http://www.denverpost.com/politics/ci_20724874/gop-democrats-take-political-scrap-online (last visited Aug. 6, 2012). Facebook thus provides a convenient and effective way for millions of voters to express support for the candidates of their choice and to become more personally involved in the political process as a result.

**3.** The Court should, accordingly, hold that Carter's Facebook activity constitutes speech that may be the basis for a retaliatory discharge claim under the

First Amendment and this Court's decision in *McVey*.[10]  At least two other circuit courts have held that putting up campaign signs, placing campaign bumper stickers on one's car, and wearing campaign paraphernalia are forms of protected speech that can support a claim for retaliatory employment action.  *See Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999) (affirming denial of defense motion for summary judgment); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 706-07, 720 (5th Cir. 1998) (affirming jury verdict for plaintiffs).  Carter's Liking of the Adams campaign's Facebook Page – and the statements that appeared on Carter's Profile, in the News Feeds of Carter's Friends, and on the campaign's Page – was no different from telling friends that he supported Adams, putting an Adams bumper sticker on his car, or planting an Adams campaign sign in his front yard.  Carter's Like on Facebook can form the predicate of his claim against Roberts for unlawful termination.

The district court did not suggest that Facebook activity could never be speech.  Instead, the district court contrasted Carter's Liking the Adams

---

[10] Under the *McVey* test, the court asks "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's [adverse employment] decision."  *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560-61 (4th Cir. 2011) (alteration in original).

13

campaign's Facebook Page with longer statements posted on Facebook that were the basis for retaliation claims in other cases. *See* J.A. 1159 (citing *Gresham v. City of Atlanta*, No. 1:10–CV–1301–RWS–ECS, 2011 WL 4601022 (N.D. Ga. Aug. 29, 2011); *Mattingly v. Milligan*, No. 4:11CV00215 JLH, 2011 WL 5184283 (E.D. Ark. Nov. 1, 2011)). That the statements at issue there were longer than the ones involved here in no way suggests that Carter did not engage in protected speech.

**B.** The district court erroneously concluded that Carter's Liking the Adams campaign's Facebook Page did not "involve[] actual statements." J.A. 1159. But there is no dispute that Carter's act produced the slogan "Jim Adams for Hampton Sheriff" alongside Adams's photo on Carter's Facebook Profile and in the News Feeds of Carter's Friends – that is simply how Facebook works. Carter's use of this basic Facebook feature to communicate that slogan to his Friends constitutes speech within the meaning of the First Amendment. *See City of Ladue*, 512 U.S. at 54-55; *Coady*, 187 F.3d at 731; *Brady*, 145 F.3d at 706-07, 720.[11]

---

[11] Even if the district court mistakenly believed that Liking a website was "symbolic" rather than literal speech, the First Amendment does not require "actual statements." *See*, *e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995) ("the Constitution looks beyond written or spoken words as mediums of expression"); *Texas v. Johnson*, 491 U.S. 397, 404-06 (1989) (holding that First Amendment protects burning the American flag and collecting cases addressing other forms of symbolic speech). In *Berger v. Battaglia*, 779 F.2d 992, 993, 996-97 (4th Cir. 1985), this Court reversed judgment entered for the defendants on a challenge to adverse employment action against a

14

The district court also concluded that Carter's Like was "not the kind of substantive statement that has previously warranted constitutional protection." J.A. 1159.  But the First Amendment is not limited to "substantive statements." "*Most* of what we say to one another lacks religious, political, scientific, educational, journalistic, historical, or artistic value (let alone serious value), but it is still sheltered from government regulation."  *United States v. Stevens*, 130 S. Ct. 1577, 1591 (2010) (internal quotation marks omitted).  Whenever a Facebook User Likes a website – whatever the subject – she generates statements that warrant protection.  Moreover, a campaign endorsement in particular need not be elaborate or lengthy to constitute political speech.  *See Jackson v. Bair*, 851 F.2d 714, 720 (4th Cir. 1988) (holding that, to be protected, a public employee's speech "need only be *upon* a matter of public concern; its practical effectiveness in addressing the concern is irrelevant").  As *City of Ladue* demonstrates, Carter need not have published a detailed analysis of the competing candidates' platforms for his speech to warrant First Amendment protection.  His endorsement of his preferred candidate is enough.

---

police officer because of his participation in controversial musical performances. *See also Corbett v. Duerring*, No. 2:10-cv-01053, 2012 WL 1855193, at *1, *6, *11 (S.D. W. Va. May 21, 2012) (denying defense motion for summary judgment on claim of unlawful discharge in retaliation for both actual speech and symbolic speech in the form of selling hot dogs).  A political endorsement is entitled to no less protection.

15

Furthermore, the evidence before the district court demonstrated that several members of the sheriff's office saw and understood Carter's message. Former deputy sheriff Robert McCoy testified that, after Carter Liked Adams campaign's Page, "everybody was saying that Danny Carter is out of there because he supported Adams openly." J.A. 159-160. Lt. Sammy Mitchell knew from Carter's Facebook Profile that Carter was supporting Adams. J.A. 1031, 1069. Capt. Robert McGee and Sgt. Theodore Ford were "shocked" to learn that Carter had visited the Adams campaign's Facebook Page. J.A. 614, 680. According to Kenneth Darling, a civilian employee of the office, Roberts himself said that "certain employees were on the Facebook page of his opponent, Jim Adams, indicating their support of Adams for Sheriff." J.A. 793. Referring to the same incident, former deputy sheriff John Sandhofer said that Roberts "express[ed] his displeasure that certain employees were openly on Jim Adams' campaign Facebook page supporting him," J.A. 592, and former deputy sheriff David Dixon described Roberts's remarks similarly, J.A. 582.[12]

---

[12] Col. Karen Bowden, the second-ranking officer in the department, testified that she did not infer from Carter's act that Carter supported Adams. *See* J.A. 444, 509. This denial alone cannot justify granting summary judgment to Roberts. *See Corbett*, 2012 WL 1855193, at *10 ("At bottom, defendants contend that they did not subjectively understand the content of plaintiff's message, and this may ultimately be the case. But if this alone were a defense to a First Amendment retaliation claim, all defendants in symbolic speech cases could win summary judgment simply by claiming that they did not grasp the message the plaintiff intended to convey.").

16

**C.**    Before the district court, Defendant Roberts argued that Carter's "intended audience was Adams' Facebook friends, not the public.  A message posted on Facebook by a member is viewed by friends only, not the world at large." J.A. 1117.  Roberts is mistaken as a matter of fact.  Each Facebook User can select who may view aspects of his or her Profile – e.g., Friends, all Facebook Users, or "the world at large."  As noted above, "Jim Adams for Hampton Sheriff" appeared on the version of Carter's Profile available to all Facebook Users, not only to Users who were Friends with Carter.  *See supra* n.8.

Even if Roberts were right on the facts, however, he would be wrong on the law.  The Supreme Court has held that the First Amendment protects the "private expression of one's views" from retaliatory employment action.  *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 412-14 (1979) (holding that statements made in "a series of private encounters between petitioner and the school principal" could support petitioner's claim of unconstitutional employment action); *see also Rankin v. McPherson*, 483 U.S. 378, 387 n.11 (1987) (affirming defendant's liability for firing plaintiff for comment made in one-on-one conversation overheard by one additional individual).  This Court has applied that principle to statements made at faculty meetings and in one-on-one meetings, *see Love-Lane v. Martin*, 355 F.3d 766, 777 (4th Cir. 2004) (reversing grant of summary judgment to defendant); a letter delivered to a single recipient, *see*

17

*Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996) (same); and comments made in a lunch table conversation in a prison staff dining room, *see Jackson*, 851 F.2d at 716, 720 (same). Even if Carter's Liking the campaign's Page had resulted only in statements visible to Carter's Friends and no one else, that speech would be protected by the First Amendment.

## CONCLUSION

For the foregoing reasons, and those stated in Plaintiffs' brief, the Court should vacate the judgment of the district court as to Daniel Ray Carter, Jr.

Respectfully submitted,

*/s/ Aaron M. Panner*
AARON M. PANNER
ANDREW E. GOLDSMITH
KELLOGG, HUBER, HANSEN, TODD,
  EVANS & FIGEL, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
(202) 326-7999 (fax)

*Counsel for Amicus Curiae*
*Facebook, Inc.*

August 6, 2012

18

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(c), the undersigned certifies that this brief complies with the applicable type-volume limitations. Exclusive of the portions exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), this brief contains 4,405 words. This certificate was prepared in reliance on the word-count function of the word-processing system (Microsoft Word 2007) used to prepare the text of this brief.

The undersigned further certifies that this brief complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 30(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times Roman font.

*/s/ Aaron M. Panner*
Aaron M. Panner

## CERTIFICATE OF SERVICE

I hereby certify that, on the 6th day of August 2012, I caused the foregoing Brief of Facebook as *Amicus Curiae* in Support of Plaintiffs-Appellants and in Support of Vacatur to be filed electronically with the Clerk of the Court using the CM/ECF system, which will send notice of such filing to all participants in the case who are registered CM/ECF users.


*/s/ Aaron M. Panner*
Aaron M. Panner